1   Barak Lurie (SBN 144887)
    Stephen J. Weaver (SBN 262121)
2   **LURIE & PARK**
    11355 West Olympic Boulevard, Suite 200
3   Los Angeles, California 90064
    Telephone: (310) 478-7788
4   Facsimile:  (310) 347-4442

5   Attorneys for Plaintiffs
    STEADIGROW, INC., ELIZABETH HAMILTON,
6   AGNES HAMILTON, and GRAHAM CLIFFORD

7

8           **UNITED STATES DISTRICT COURT**

9           **CENTRAL DISTRICT OF CALIFORNIA**

10

11   STEADIGROW, INC., a California       Case No.  **SACV10-837 JVS(MLGx)**
    corporation, ELIZABETH HAMILTON,
12   an individual; AGNES HAMILTON, an
    individual; and GRAHAM CLIFFORD,   COMPLAINT FOR:
13   an individual,

14              Plaintiff,             (1)  Fraud in the Inducement
                                         (Claim I)
15   vs.                             (2)  Breach of Fiduciary Duty
                                  (3)  Intentional Misrepresentation
16   MICHAEL EMANUEL; ELEMENT 6      (4)  Negligent Misrepresentation
    PRODUCTS, LLC; DOES 1 through 50,    (5)  State Unfair Competition
17   inclusive,                         (6)  Concealment
                                  (7)  Fraud in the Inducement
18                                       (Claim II)
                Defendants.         (8)  Breach of the Duty of Loyalty
19                                   (9)  Misappropriation of Trade
                                      Secrets
20                             (10) Federal Trademark
                                    Infringement (15 USC §1114
21                           (11) Federal Unfair Competition
                                  (12) Federal Trademark Dilution
22                           (13) California Bus. & Prof. Code
                                    §§ 14320
23                           (14) State Trademark Dilution
                          (15) California Bus. & Prof. Code
24                                     §§ 17500 and 17535
                          (16) Permanent Injunction
25                           (17) Receivership
                          (18) Breach of Contract
26                           (19) Unjust Enrichment

27                           [DEMAND FOR JURY TRIAL]

28

LURIE & PARK
LOS ANGELES

All Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1131 and 1338 because Plaintiffs' claims arise under the trademark laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367 over Plaintiffs' claims that arise under the laws of the State of California.

2.      This Court has personal jurisdiction over the Defendants because each Defendant is located in and transacts business in the State of California.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts complained of herein occurred in this judicial district and each party is subject to personal jurisdiction in this judicial district.

## NATURE OF ACTION

4.      This is an action for trademark infringement, unfair competition, and other relief arising under the trademark laws of the United States, specifically 15 U.S.C. § 1051 et. Seq. (the "Lanham Act"), and the statutes and common law of the State of California.

## GENERAL ALLEGATIONS

5.      Plaintiff STEADIGROW, INC. ("STEADIGROW") is a corporation, organized under the laws of the State of California, with its principal executive office at 26895 Aliso Creek Road # B525, Aliso Viejo, California.

6.      Plaintiff ELIZABETH HAMILTON, AKA ELIZABETH GUIMOND ("ELIZABETH") is an individual residing in Laguna Woods, California in the County of Orange.

LURIE & PARK
Los Angeles

2
COMPLAINT

1    7.    Plaintiff AGNES HAMILTON ("AGNES") is an individual residing in

2    Brisbane, Australia.

3    8.    Plaintiff GRAHAM CLIFFORD ("GRAHAM") is an individual

4    residing in Colac Victoria, Australia.

5    9.    Plaintiff MARY CLIFFORD ("MARY") is an individual residing in

6    Colac Victoria, Australia.

7    10.    Defendant MICHAEL EMANUEL ("EMANUEL") is an individual

8    residing in Ladera Ranch, Orange County, California.

9    11.    Defendant ELEMENT 6 PRODUCTS, LLC ("ELEMENT 6") is a

10   limited liability company, organized under the laws of California, with its principal

11   office in the territorial jurisdiction of this Court.

12   12.    Plaintiffs do not know the true names and capacities, whether

13   individual, corporate, associate or otherwise, of Defendants named herein as Does 1

14   through 50, inclusive. Plaintiffs therefore sue those Defendants by such fictitious

15   names. On information and belief, each Defendant sued herein as Doe is in some

16   way legally responsible for the acts alleged herein. Plaintiffs will amend this

17   Complaint to show the true names and capacities of said Defendants when they

18   subsequently ascertain such information.

19   13.    Plaintiffs are informed and believe, and on that basis allege, that at all

20   times mentioned in this Complaint, Defendants were the agents and employees of

21   their co-Defendants and acting within the course and scope of such agency and

22   employment with the permission and consent of their co-Defendants and doing the

23   things alleged in this Complaint within the course and scope of said agency and

24   employment.

25

26   I.    _Background to STEADIGROW and MULCH BLOCK®_

27   14.    AGNES held key positions in the garden industry in Australia from

28   1992 to 2002. She developed products and marketed them to key accounts and box

LURIE & PARK
Los Angeles

3

COMPLAINT

stores in Australia.  An Australian garden product company contracted with

ELIZABETH for her to market a product on the West Coast of the U.S.

15.  In 2002, AGNES, ELIZABETH and an Australian business partner,

Ian Sivell ("Ian"), agreed to develop a water saving product and market it in the US.

AGNES and Ian worked with a chemist in Australia to develop the formula, and

ELIZABETH worked with the necessary import, governmental, agriculture and

registration agencies in the U.S.  These three formed STEADIGROW to

manufacture and distribute the products they had developed.

16.  AGNES developed an organic by-product of the coconut, a

compressed block that she marketed in Australia as the "Mega Mulch Block."

Galuku Coir Sri Lanka packed and supplied this product.  In 2004, AGNES,

ELIZABETH, and Ian began planning to sell the Mulch Block® and other products

in the US.  They began planning the product labels, price lists, and packaging,

marketing materials, registrations processes, and they obtained a supplier from Sri

Lanka to launch their products in 2005.

17.  In approximately July 2005, as a result of Ian's default on his

investment promise, AGNES received from Ian the rights to the labels and products

for sale in the US.  AGNES received these rights through the Australian courts in or

around April 2006.

18.  AGNES and ELIZABETH had each invested around $60,000 each (for

a total of $120,000) which had been used for development and travel expenses

associated with the product.

19.  One or more of Plaintiffs applied for the Mulch Block® trademark in

July 2005.  Rob Ferrie created the graphics for the trademark and labels.

20.  GRAHAM and MARY (Collectively, the "CLIFFORDS")

subsequently made an investment of $36,000 to develop a new range of products

and to acquire an ownership stake in STEADIGROW.

COMPLAINT

II.     *Defendants Meet Mike Emanuel*

21.     ELIZABETH and AGNES met EMANUEL in the course of searching for additional funding for STEADIGROW.  EMANUEL convinced ELIZABETH and AGNES that he had the necessary contacts and that he could raise the additional capital necessary for STEADIGROW's business.

22.     On or about March 10, 2006, EMANUEL provided a deal memo in which he agreed to locate the additional funding in exchange for the following:  (1) 50% interest in STEADIGROW, (2) a capital contribution of $50,000, and (3) a $50,000 loan for expenses.

23.     EMANUEL convinced ELIZABETH and AGNES that they had to form a new company to sell STEADIGROW's products in the US.  EMANUEL stated that this was necessary to allow a smoother distribution of the products, and separate the manufacturing and distribution of the products.

24.     In fact, the real reason EMANUEL suggested this division and creation of a separate distribution company was to "wipe out" STEADIGROW'S debts to the other Plaintiffs in the development of the Mulch Block®, effectively attempting to transfer his and STEADIGROW's newly acquired debts to the new company he would form.  Another reason was to enable EMANUEL to more easily assume control over the distribution of the products, and the business itself.

25.     To that end, on January 30, 2006, EMANUEL caused ELEMENT 6 Products, LLC to be registered in California, with the following membership interests:   Michael Emanuel - 50%; Agnes Hamilton - 22.5%; Elizabeth Guimond - 19.5%; Graham and Mary Clifford - 8%.

26.     EMANUEL deposited the funds into a bank account for ELEMENT 6, which only he managed, and for which he was the only signatory.

27.     EMANUEL provided a simple loan document for the $50,000 that contained terms of prime, plus 2%, payable in three years.

28.    After having met Plaintiffs, EMANUEL became aware that STEADIGROW was formed to manufacture and import value-added 100% organic garden products for the retail and commercial lawn and garden industry. EMANUEL then insisted on incorporation of a new company, Defendant ELEMENT 6, to exploit the proven retail success of the product in Australia, by distributing STEADIGROW'S products here in the U.S and elsewhere as may be appropriate.

29.    EMANUEL had agreed to work part-time for the first twelve months, for paid compensation as part of his investment. In addition, he would receive 50% membership interest in ELEMENT 6. AGNES also agreed to work for a period of twelve months to develop the business and product range and until the company was financially viable.

30.    In or about 2006, AGNES received an offer to distribute and market in the U.S. the products of a company called "Seasol." Seasol had a retail market in Australia of approximately $10 million per year and thus had the potential to provide ELEMENT 6 with millions of dollars in income. Based on the success and promise of ELEMENT 6 Products, Seasol signed an exclusive distributorship agreement with ELEMENT 6. EMANUEL upset the management team at Seasol on several occasions. He also packaged samples of Seasol in Mulch Blocks that EMANUEL had arranged to sell in Canada. Worse, he did so before obtaining any orders from any stores in Canada to sell Seasol products. Upon discovering this, Seasol cancelled its contract with ELEMENT 6.

31.    EMANUEL also failed to take steps to find additional investors as he had agreed, and which was a primary basis for agreeing to work with EMANUEL in the first place. AGNES and ELIZABETH suggested outside investors they had found, but EMANUEL declined and instead offered to make a further loan of $150,000.

6

COMPLAINT

32.   EMANUEL put the additional $150,000 into ELEMENT 6's account before any loan documents were signed. Plaintiffs now understand that EMANUEL did this so his shares were not diluted through other investors, and his personal enrichment plans were not derailed; he did not do so for the health of the business overall.

33.   ELEMENT 6's attorney prepared loan papers for EMANUEL for the above-referenced additional $150,000. In March 2007, EMANUEL provided these loan documents to Plaintiffs. However, Plaintiffs rejected the terms of the loan documents, and refused to sign the loan documents.

34.   In October 2007, despite the severe objections of the members, EMANUEL attempted to cancel the mail post box that other members had access to at a physical address for ELEMENT 6 and redirect the mail to a mail post box address near his home. This action would result in having to change all of ELEMENT 6's registered labels and all of the information listed with numerous Government entities that also require a "physical address," and incur high unnecessary costs. EMANUEL could not explain his basis for making this change. EMANUEL made the change in order to keep information (such as his plans regarding the usurpation of ELEMENT 6) concealed from them.

35.   In June 2007, AGNES asked EMANUEL to provide a simple loan agreement for the new $150,000 he had put into the company, similar to the one for the original $50,000 loan. EMANUEL failed to provide one.

36.   On March 10, 2008, EMANUEL accessed the United States Patent and Trademark Office ("USPTO") website and re-assigned the trademark for the Mulch Block® from STEADIGROW to ELEMENT 6. He did so without any authorization from any officer, director or shareholder of STEADIGROW to assign the trademark, or any of the Plaintiffs. EMANUEL did not inform any officer, director or shareholder of STEADIGROW, or any then member of ELEMENT 6 that he had assigned STEADIGROW's trademark to ELEMENT 6.

LURIE & PARK
Los Angeles

7

37.   In August 2007, EMANUEL advised AGNES that he wanted out of the company and members could buy him or he would buy out the members and subsequently offered a buy/sell utilizing a "Texas shootout method." This was voted out by the members, and ELIZABETH and AGNES responded to EMANUEL that they would find their own investors to buy him out and asked him to provide information regarding the company's finances and orders, since he had not provided information for more than three months. EMANUEL failed consistently to provide any financial information to the other members.

38.   In August 2007, and still without having provided any requested financial information, EMANUEL offered to buy out the membership interests of the other members for a total of $10,000.

39.   In September 2007, EMANUEL paid off the company credit card and paid other amounts, which did not need to be immediately paid. He then declared the company in default on payments on his loan. At all relevant times, EMANUEL maintained sole control of the bank account and could have paid the amounts due on his loan but elected not to do so. He elected not to do so, so that he could declare a default on his loan. He would use this as a purported justification to take over ELEMENT 6.

40.   After declaring the default, EMANUEL claimed that he now owned a supermajority of ELEMENT 6 (despite the members having refused to sign the loan agreement prepared on behalf of Emanuel) and thereafter purported to modify the operating agreement.

41.   In February 2008, EMANUEL placed orders with ELEMENT 6's supplier. However, he represented to the other ELEMENT 6 members that no purchase orders had been received. EMANUEL continued to withhold information from ELEMENT 6 members regarding these purchase orders, which had in fact been received, contrary to his affirmative representations.

LURIE & PARK
Los Angeles

COMPLAINT

42.   During the fall of 2007, EMANUEL refused to forward the Quick Books accounting information for ELEMENT 6 to the other members or allow any member to have a copy. This behavior of hindering, delaying or denying access to records of financial information continued from this point in time until the present day.

43.   On January 31, 2008, ELIZABETH and AGNES requested that EMANUEL give sales updates and forecasts for ELEMENT 6. EMANUEL failed to respond, other than with generalized information that provided no detail regarding monetary estimates or impending sales. Most importantly, he failed to include any information regarding sales to Canadian Tire, ELEMENT 6's largest customer. Despite having been asked on three separate occasions, Emanuel refused to provide information regarding sales to Canadian Tire. He also refused to provide copies of purchase orders given to ELEMENT 6's supplier, despite requests from the members.

44.   In fact, EMANUEL had obtained more than $146,000 in orders, which he failed to disclose. On January 31, 2008, EMANUEL sent an email to the members of ELEMENT 6 that purported to list actual sales. EMANUEL intentionally excluded any mention of orders from Canadian Tire from the report. EMANUEL failed and refused to provide a report detailing all purchase orders received by ELEMENT 6 despite having received three separate requests from AGNES to provide said information. At a meeting of the members on February 22, 2008, EMANUEL intentionally withheld information from the members regarding purchase orders that had been placed for ELEMENT 6 products. EMANUEL was aware of the purchase orders because he had placed the orders with ELEMENT 6's supplier for delivery by April 2008. Upon information and belief, he placed those orders on or before February 20, 2008. EMANUEL failed to inform the members of in excess of $146,816 in purchase orders by Canadian Tire and continued to do so.

45.   Also during this time period, EMANUEL created product labels without the knowledge of the members, and used copyrighted graphics without obtaining the permission of the artist/copyright owner.

46.   On March 17, 2008, all the members served EMANUEL with a signed letter asking for his resignation.  EMANUEL ignored the letter.

47.   Specifically, on October 26, 2007, EMANUEL declared that a default had occurred, and claimed that he was thereby entitled to a supermajority voting position due to the default.  EMANUEL then unilaterally revised Exhibit B of the Operating Agreement of ELEMENT 6 to reflect an increase in his ownership interest and decrease in the ownership interest of the other members.  The other members of ELEMENT 6 notified EMANUEL that they disputed his declaration of the default and his claim of supermajority interest in ELEMENT 6.

48.   EMANUEL orchestrated a "default" of his loan by prepaying credit card balances in full and making other payments that were not yet due, while failing to pay the payments on his loan.  He was also continuously running up exorbitant expenses without any discussion or approval from the members ahead of time.  He blatantly ignored members' objections to his investment or spending decisions, and acted as if he alone owned and controlled the company.

49.   During the above-referenced February 22, 2008 meeting, EMANUEL specifically advised that the company was in serious financial distress.  To that end, he provided inaccurate information on orders.  EMANUEL made a concerted effort to mislead the other members so that he could wrest control from them for his own benefit.

50.   At the Las Vegas Lawn and Garden Show in April-May 2008, EMANUEL pulled clients and representatives of those clients aside to discuss business matters with them and prevented AGNES from learning about the business discussions.  Without informing any members of ELEMENT 6, EMANUEL had created a new product in Coir peat, in similar graphics as created by Rob Ferrie

LURIE & PARK
Los Angeles

10

COMPLAINT

1   (who had prepared the graphics for ELEMENT 6) without obtaining permission of

2   Ferrie or any of the Plaintiffs.

3       51.    Of additional concern, EMANUEL changed the labels without

4   registering them or advising the California Department of Agriculture, thereby

5   subjecting ELEMENT 6 to possible liability and fines.

6       52.    At the Las Vegas Lawn and Garden Show in May 2009, AGNES,

7   ELIZABETH, and Graham discovered, to their surprise, that EMANUEL was

8   distributing printed leaflets for a company called "Good Reps Are Hard To Find"

9   with a website located at www.goodrepsarehardtofind.com. The other members

10   were not informed as to why EMANUEL was involved in promoting this with

11   ELEMENT 6's main representatives from Canada and the West Coast at an

12   ELEMENT 6 paid booth and function.

13       53.    EMANUEL has failed and refused to provide the annual return or K1

14   certificates for ELEMENT 6 for 2009.

15       54.    EMANUEL has registered a new domain, and launched a similar

16   product named "Mulch Brick" and placed the Mulch Brick on The Original Mulch

17   Block® website. He has continued to sell The Original Mulch Block® after

18   receiving a letter from counsel for STEADIGROW, AGNES, and ELIZABETH

19   demanding that he cease and desist from infringing upon STEADIGROW's

20   trademark and from engaging in unfair competition. EMANUEL has placed the

21   Mulch Brick on Amazon.com, using The Original Mulch Block® description, and

22   has further placed the DVD made for The Original Mulch Block® on the web site.

23       55.    The Original Mulch Block® consists of compressed, water-saving

24   mulch comprised of coir, the husk byproduct of the coconut. The product is

25   uniquely packaged in compressed 11" square blocks that, after adding water,

26   expand to the same size as a traditional 2 cubic foot bag of mulch.

27       56.    Ownership of the Mulch Block® registered trademark is held by a

28   separate entity owned by ELIZABETH. The Mulch Block® name and design

1   were registered with the U.S. Patent and Trademark office on March 20, 2007

2   (registration no. 3219506).

3       57.   ELEMENT 6 has an exclusive supply relationship for the US with

4   Galuku, one of the largest suppliers of compressed coir products in Sri Lanka.

5   EMANUEL jeopardized this contract on more than one occasion.

6       58.   EMANUEL advised members in August 2007 that company's funds

7   were depleted, yet he made the decision to pay many bills and eliminate credit card

8   debt while electing not to pay the interest on his loan/capital contribution.

9       59.   On March 17, 2008, EMANUEL sent an email claiming that there was

10  an opportunity to sell additional product to Canadian Tire. He stated that the "did

11  not have a firm PO" for the additional product but that he had confidence it would

12  happen. He stated that he wanted to use a new supplier to meet this need for

13  additional product.

14      60.   In April 2008, AGNES became deeply upset when she learned that a

15  known risk was being taken relating to the weights and measures not matching her

16  Mulch Block® labels. She also discovered that EMANUEL was trying to fit more

17  blocks onto pallets and he did not want to pay extra container fees for weight, so

18  therefore lightened the blocks. Based on this conduct, she issued a stern warning to

19  EMANUEL. EMANUEL stated in an email around this time that he was "willing

20  to take the risk".

21      61.   An Ace Hardware dealer in New Jersey received fines from the local

22  weights and measures department because The Original Mulch Block® weighed

23  less than the stated weight on the label.

24      62.   As a result, ELEMENT 6 incurred financial liability for the amount of

25  the fine, as well as additional expenses for printing stickers and placing them on the

26  existing products, plus paying for the labor of Ace Hardware employees to put the

27  stickers on the products.

28

LURIE & PARK
LOS ANGELES

12

COMPLAINT

63.    On or about March 2008, EMANUEL sought to place a 6-container order with a coir supplier/manufacturer in India – Bros India – for product to be sold to Canadian Tire. Plaintiffs are informed and believe, and thereon allege, that Emanuel jeopardized their main client Canadian Tire, the contract with Galuka, and their intellectual property by sending an order via email and/or other electronic format to companies without ELEMENT 6's knowledge. EMANUEL'S order would have occurred without having proper quality control for safety and soil tests to ensure that it met ELEMENT 6's product specifications. Again, this adversely impacted the integrity of The Original Mulch Block® product, and the reputation of ELEMENT 6.

64.    EMANUEL then began creating other products without involving or informing the Product Development Manager of ELEMENT 6, or anyone else at ELEMENT 6, or any of the Plaintiffs.

65.    On April 28, 2009, Rob Ferrie, creator of all original artworks used on ELEMENT 6 products, and owner of the copyright in said artworks, transferred all of his copyright interest to STEADIGROW. Ferrie also transferred all copyright rights in the ELEMENT 6 products logo design to AGNES and ELIZABETH.

66.    Directly after providing the "loan" previously described above to the business, in March of 2007, EMANUEL began paying himself $6500.00 per month in salary for part-time work while working at another company in Los Angeles called Putnam Sourcing Group. He also began taking an average of $1800.00 per month in interest payments for the next 29 months. In total, he took for himself at least $180,500.00 in salary and $30,000 in interest payments. EMANUEL also paid himself approximately $42,000.00 and he continuously ran up exorbitant expenses without any approvals from any of the Plaintiffs (expensive lunches, entertainment, personal legal bills, flights, and other personal items). He took the foregoing actions in direct violation of the Operating Agreement, which requires

1    that the company board must first approve substantive expenses before they are

2    incurred.

3        67.    EMANUEL fired AGNES, the creator and product development

4    manager, from her position without any discussion or members' knowledge.

5    AGNES was only paid $16,500.00 for this entire period.   ELIZABETH received

6    no compensation for all of her work and only a few thousand dollars for part of her

7    expenses, most of which she paid out of her own pocket including travel and

8    business expenses to visit clients in Australia, trade shows in USA and expenses to

9    operate as Product Development Manager over 2006-2008.   GRAHAM received

10   nothing and paid for his own trip to the U.S. to find out what was happening with

11   the business in 2009.  None of the Plaintiffs ever received any consideration for any

12   of his or her time, investment, and expenses, thousands of combined work hours,

13   product development or positions in the company.  Only EMANUEL received any

14   such consideration, which was substantial.  By contrast, Plaintiffs incurred only

15   massive debts and personal loss with EMANUEL as ELEMENT 6's business

16   manager.

17       68.    On July 13, 2009, Robert Klein, Esq. sent a letter on behalf of

18   AGNES, ELIZABETH, GRAHAM and MARY stating that they resigned from any

19   position, management or otherwise, with ELEMENT 6 and withdrew from that

20   entity and stated that the letter was an assignment of their interests in ELEMENT 6

21   to ELEMENT 6 and/or its remaining members.  The letter also advised that the

22   trademark "Mulch Block®" registered in the USPTO as Reg. No. 3,219,506, owned

23   by STEADIGROW and wrongfully transferred by EMANUEL to ELEMENT 6 had

24   been reassigned to STEADIGROW as the rightful owner of that trademark.  The

25   letter informed EMANUEL that all artwork and graphics that appear on any label of

26   mulch products sold by ELEMENT 6 had been assigned by the copyright owner to

27   AGNES, ELIZABETH, GRAHAM and MARY.

28

LURIE & PARK
Los Angeles

14

COMPLAINT

69.   Further on July 13, 2009, a certified letter was sent by prior counsel for Plaintiffs to EMANUEL stating that any future use by ELEMENT 6 of either the trademark "Mulch Block®" or other mark deceptively similar to STEADIGROW's mark would be considered an infringement of a federally registered trademark and a violation of the Lanham Act.  The further advised Emanuel and ELEMENT 6 to refrain from any further sales of any product bearing any of the original artwork created by Rob Ferrie and subsequently assigned to Plaintiffs.  The letter further demanded that EMANUEL and ELEMENT 6 cease and desist from any action or conduct that would amount to trademark or copyright infringement or acts of unfair competition.

70.   On July 24, 2009, David Wilshin, corporate attorney for ELEMENT 6 sent a letter stating that he had informed Emanuel that he could not represent him regarding the ownership of the trademark.

71.   EMANUEL and ELEMENT 6 have gone to extraordinary lengths to confuse STEADIGROW'S products with their own, including but not limited to misappropriating specific Uniform Product Codes ("UPC's") for STEADIGROW's products.

## FIRST CAUSE OF ACTION

### (Fraud In The Inducement – Against EMANUEL and DOES 1 to 50, Inclusive)

72.   Plaintiffs hereby incorporate by reference paragraphs 1 through 71 of this Complaint as if set forth in full in this paragraph.

73.   At a meeting of the members on February 22, 2008, EMANUEL made the above representations, including those referenced in ¶¶ 40 and 45, to induce Plaintiffs to agree to form ELEMENT 6, to induce the Plaintiffs to give shares and control of ELEMENT 6 to EMANUEL, and to induce STEADIGROW to allow ELEMENT 6 to distribute and sell STEADIGROW's products.

74.  Plaintiffs reasonably believed EMANUEL's representations and acted in reasonable reliance those representations.

75.  As a result, Plaintiffs allowed EMANUEL access to and control of ELEMENT 6.  EMANUEL has used his access and control to enrich himself at the expense of the business and at the expense of Plaintiffs.

76.  EMANUEL's misrepresentations damaged Plaintiffs in an amount unknown as of yet, but within the jurisdictional limit of this Court, subject to proof at trial but which Plaintiffs estimate to be not less than $2 Million, plus interest at the legal rate, and costs of suit herein, or in such other amount as Plaintiffs may subsequently establish at trial, but which Plaintiffs estimate to be no less than $2 million.

77.  The conduct of EMANUEL and Does 1 through 50, inclusive, is, and has been, intentional, malicious, oppressive, and despicable, and is, and has been, designed to injure Plaintiffs.  Each Plaintiff herein is therefore entitled to an award of punitive damages against these named Defendants herein in an amount according to proof.

## SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty – Against EMANUEL and DOES 1 to 50, Inclusive)**

78.  Plaintiffs hereby incorporate by reference paragraphs 1 through 77 of this Complaint as if set forth in full in this paragraph.

79.  In his capacity as Manager of ELEMENT 6, EMANUEL has breached his fiduciary duties to Plaintiffs ELIZABETH, AGNES, GRAHAM, and MARY by intentionally doing and/or failing to do things which, include, but are not limited to, each of the following:

    (a)  By controlling and maintaining the books, records, and contracts of ELEMENT 6 in almost total secrecy, only allowing the other members of ELEMENT 6 infrequent and limited scope access, since the formation of ELEMENT 6;

1      (b)    By attempting to engage, and engaging in, transfers of the

2                   membership interests of ELIZABETH and AGNES to

3                   EMANUEL without their consent and the consent of the other

4                   members, in violation of the Operating Agreement of

5                   ELEMENT 6;

6      (c)    By agreeing to loan terms which benefited himself to the

7                   detriment of ELEMENT 6, agreeing to loan repayment terms

8                   which he knew ELEMENT 6 would not be able to keep, and by

9                   deliberately failing to make loan payments on the loan from

10                 EMANUEL to ELEMENT 6, with the intention of declaring a

11                 default and subsequently wrongfully transferring additional

12                 membership interest in ELEMENT 6 to EMANUEL;

13     (d)    By mismanaging the registration of ELEMENT 6's labels with

14                 the California Department of Agriculture by making changes to

15                 the labels and not advising the California Department of

16                 Agriculture, and by launching products and not registering them;

17     (e)    By instructing the manufacturer to produce products at less than

18                 the weight stated on the labels, thereby subjecting the company

19                 to fines and other costs;

20     (f)    By using copyrighted graphics on labels for new products

21                 without obtaining the permission of the artist/copyright owner;

22                 and

23     (g)    By including samples of Seasol products in Mulch Blocks sold

24                 in Canada before obtaining any orders from stores in Canada to

25                 sell Seasol products, thereby causing SEASOL to cancel its

26                 exclusive distributorship agreement with ELEMENT 6.

27

28

80.   EMANUEL failed to act as a reasonably careful Managing Member would have acted under the same or similar circumstances.

81.   As a result of EMANUEL's breach of his fiduciary duties to Plaintiffs, Plaintiffs were harmed.

82.   EMANUEL's conduct was a substantial factor in causing harm to Plaintiffs.

83.   EMANUEL's breach of his fiduciary duties damaged Plaintiffs in an amount unknown as of yet, but within the jurisdictional limit of this Court, subject to proof at trial but which Plaintiffs estimate to be not less than $2 Million, plus interest at the legal rate, and costs of suit herein, or in such other amount as Plaintiffs may subsequently establish at trial but which Plaintiffs estimate to be not less than $2 Million.

84.   The conduct of EMANUEL is, and has been, intentional, malicious, oppressive, and despicable, and is, and has been, designed to injure Plaintiffs. Each Plaintiff herein is therefore entitled to an award of punitive damages against these named Defendants herein in an amount according to proof.

### THIRD CAUSE OF ACTION

**(Intentional Misrepresentation – Against EMANUEL and DOES 1 to 50, Inclusive)**

85.   Plaintiffs hereby incorporate by reference paragraphs 1 through 84 of this Complaint as if set forth in full in this paragraph.

86.   EMANUEL's representations that he had the necessary expertise and contacts to secure additional investors and raise additional capital for Plaintiffs' business were false and were made for the purpose of inducing Plaintiffs to form a new company to distribute and sell STEADIGROW's products, and to agree to transfer 50% ownership and the right to control their business to EMANUEL, so that he could subsequently take over full control of their Plaintiffs' business.

COMPLAINT

LURIE & PARK
LOS ANGELES

87.   At the time EMANUEL made the representations set forth herein to Plaintiffs, he knew they were false.

88.   As a result of the intentional misrepresentation by EMANUEL, Plaintiffs have been damaged in an amount unknown as of yet, but within the jurisdictional limit of this Court, subject to proof at trial but which Plaintiffs estimate to be not less than $2 Million, plus interest at the legal rate, attorneys' fees and costs of suit herein, or in such other amount as Plaintiffs may subsequently establish at trial but which Plaintiffs estimate to be not less than $2 Million.

89.   The conduct of EMANUEL is, and has been, intentional, malicious, oppressive, and despicable, and is, and has been, designed to injure Plaintiffs.  Each Plaintiff herein is therefore entitled to an award of punitive damages against these named Defendants herein in an amount according to proof.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation – Against EMANUEL and DOES 1 to 50, Inclusive)

90.   Plaintiffs hereby incorporate by reference paragraphs 1 through 89 of this Complaint as if set forth in full in this paragraph.

91.   EMANUEL should have known with the exercise of ordinary care that the above representations to Plaintiffs were false.

92.   Plaintiffs lacked knowledge of the falsity of EMANUEL's misrepresentations and believed them to be true.

93.   In reliance upon EMANUEL's misrepresentations, Plaintiffs agreed to form ELEMENT 6 to distribute STEADIGROW's products, and to give EMANUEL 50% ownership interest of ELEMENT 6.

94.   Had Plaintiffs known the true facts, they would never have formed ELEMENT 6, nor agreed to give EMANUEL 50% ownership interest of ELEMENT 6.

95.   Plaintiffs justifiably relied on EMANUEL's representations.

LURIE & PARK
Los Angeles

19

COMPLAINT

96. As a proximate result of EMANUEL's misrepresentations herein, Plaintiffs have suffered damage in an amount to be determined at trial but which Plaintiffs estimate to be not less than $2 Million.

97. The conduct of EMANUEL and Does 1 through 50, inclusive, is, and has been, intentional, malicious, oppressive, and despicable, and is, and has been, designed to injure Plaintiffs. Each Plaintiff herein is therefore entitled to an award of punitive damages against these named Defendants herein in an amount according to proof.

## FIFTH CAUSE OF ACTION
### (State Unfair Competition, Cal. Bus. & Prof. Codes § 17200 and § 17203 *et seq.* - Against EMANUEL, ELEMENT 6 and DOES 1 to 50, Inclusive)

98. Plaintiffs hereby incorporate by reference paragraphs 1 through 97 of this Complaint as if set forth in full in this paragraph.

99. DEFENDANTS' conduct as described above, including but not limited to, willfully violating STEADIGROW'S trademark rights and the remaining Plaintiffs' ability to run their business(es), constitutes unfair business practices.

100. DEFENDANTS' unlawful, unfair and/or fraudulent acts or practices as alleged above, were committed pursuant to business activity, and in violation of Cal. Bus. & Prof. Codes § 17200.

101. As a result of DEFENDANTS' unlawful, unfair and/or fraudulent acts or practices, Plaintiffs are entitled to restitution, damages in an amount to proven at trial but which Plaintiffs estimate to be not less than $2 Million, and injunctive relief.

## CAUSE OF ACTION
### (Concealment - By ELIZABETH, AGNES, and CLIFFORD Against EMANUEL and DOES 1-50)

102. Plaintiffs hereby incorporate by reference paragraphs 1 through 101 of this Complaint as if set forth in full in this paragraph.

LURIE & PARK
Los Angeles

103.   Plaintiffs ELIZABETH, AGNES, and CLIFFORD were members of ELEMENT 6.  EMANUEL was the Managing Member of ELEMENT 6.  As set forth above, EMANUEL failed to disclose important facts to Plaintiffs regarding the financial status of ELEMENT 6.

104.   As evidenced above, EMANUEL disclosed some facts to Plaintiffs but intentionally failed to disclose other important facts, making the disclosure deceptive.

105.   EMANUEL intentionally failed to disclose important facts that were known only to him and that Plaintiffs could not have discovered by reasonable diligence, or because Plaintiffs had reposed substantial trust in EMANUEL, which justified them not pursuing further information.  As a result of his exploitation of this trust, EMANUEL actively concealed important facts from Plaintiffs and prevented them from discovering those facts.

106.   Plaintiffs did not know of the concealed facts.

107.   EMANUEL intended to deceive Plaintiffs by concealing the facts, as set forth above.

108.   Plaintiffs reasonably relied upon EMANUEL's disclosures and statements, particularly (1) the extent to which ELEMENT 6's business was allegedly failing; (2) the attempt to convert the above-referenced trademark for his own benefit; (3) the above-referenced default on the loan; and (4) the weights and measures violations described above, among the other referenced wrongs above.

109.   As a result of EMANUEL's deception, Plaintiffs were harmed.

110.   EMANUEL's concealment was a substantial factor in causing Plaintiffs harm.

111.   As a proximate result of EMANUEL's concealment, Plaintiffs have suffered damage in an amount to be determined at trial but in an amount which Plaintiffs estimate to be not less than $2 million.

LURIE & PARK
Los Angeles

21

1    112.   The conduct of EMANUEL and Does 1 through 50, inclusive, is, and

2  has been, intentional, malicious, oppressive, and despicable, and is, and has been,

3  designed to injure Plaintiffs. Each Plaintiff herein is therefore entitled to an award

4  of punitive damages against these named Defendants herein in an amount according

5  to proof.

6                        **SEVENTH CAUSE OF ACTION**
                **(Fraud in the Inducement (Claim II) - By ELIZABETH, AGNES, and**
7                **CLIFFORD Against EMANUEL and DOES 1-50)**

8    113.   Plaintiffs hereby incorporate by reference paragraphs 1 through 112 of

9  this Complaint as if set forth in full in this paragraph.

10   114.   EMANUEL promised Plaintiffs that he would obtain investors and/or

11  sources of capital for ELEMENT 6 in exchange for EMANUEL being given 50%

12  of ELEMENT 6.

13   115.   Plaintiffs would never have agreed to give EMANUEL 50% of the

14  ownership in ELEMENT 6, but for EMANUEL's promise to obtain additional

15  capital and investment sources for ELEMENT 6.

16   116.   EMANUEL did not intend to perform this promise when he made it.

17   117.   EMANUEL intended that Plaintiffs rely upon his promise.

18   118.   Plaintiffs reasonably relied upon EMANUEL's promise.

19   119.   EMANUEL did not locate outside sources of funding. Rather, he

20  made loans to ELEMENT 6, which he knew as the Managing Member of

21  ELEMENT 6 that ELEMENT 6 would not be able to comply with. EMANUEL

22  failed to make loan payments from ELEMENT 6 to himself in order to pay back the

23  loan, thereby providing a basis for EMANUEL to declare the loan in default and to

24  obtain a super-majority interest in ELEMENT 6. EMANUEL's true purpose was to

25  exploit the business opportunities and assets of ELEMENT 6 itself, including his

26  intention to sell and market the Mulch Block® concept through other companies

27  over which he had separate control.

28

LURIE & PARK
Los Angeles

                                    COMPLAINT

1    120. As a result of EMANUEL's misrepresentations, Plaintiffs have

2    suffered damages in an amount to be determined at trial, but in an amount which

3    Plaintiffs estimate to be not less than $2 million.

4        121. Plaintiffs' reliance on EMANUEL's promise was a substantial factor

5    in causing Plaintiffs harm.

6        122. The conduct of EMANUEL and Does 1 through 50, inclusive, is, and

7    has been, intentional, malicious, oppressive, and despicable, and is, and has been,

8    designed to injure Plaintiffs. Each Plaintiff herein is therefore entitled to an award

9    of punitive damages against these named Defendants herein in an amount according

10   to proof.

11               **EIGHTH CAUSE OF ACTION**
               **(Breach of the Duty of Loyalty - By ELIZABETH, AGNES, and CLIFFORD**
12                    **Against EMANUEL and DOES 1-50)**

13       123. Plaintiffs hereby incorporate by reference paragraphs 1 through 122 of

14   this Complaint as if set forth in full in this paragraph.

15       124. EMANUEL was the Managing Member of ELEMENT 6, along with

16   Plaintiffs ELIZABETH, AGNES and CLIFFORD, who were also members of

17   ELEMENT 6.

18       125. EMANUEL knowingly acted against the interests of Plaintiffs, as set

19   forth above.

20       126. Plaintiffs did not give informed consent to EMANUEL's conduct.

21       127. As a result of EMANUEL's breach of his duty to Plaintiffs, Plaintiffs

22   have been damaged in an amount unknown as of yet, but within the jurisdictional

23   limit of this Court, subject to proof at trial but which Plaintiffs estimate to be not

24   less than $2 million, plus interest at the legal rate, attorney's fees and costs of suit

25   herein, or in such other amount as Plaintiffs may subsequently establish at trial but

26   which Plaintiffs estimate to be not less than $2 Million.

27       128. The conduct of EMANUEL and DOES 1-50, Inclusive, is and has

28   been intentional, malicious, oppressive and despicable and is, and has been,

1  designed to injure Plaintiffs.  Each Plaintiff herein is therefore entitled to an award

2  of punitive damages against these named Defendants herein in an amount according

3  to proof.

4  **NINTH CAUSE OF ACTION**

5  **(Misappropriation of Trade Secrets - By STEADIGROW, INC. Against EMANUEL and DOES 1-50)**

6  129.  Plaintiffs hereby incorporate by reference paragraphs 1 through 128 of

7  this Complaint as if set forth in full in this paragraph.

8  130.  STEADIGROW was the owner of trade secrets, including customer

9  lists and supplier lists.

10  131.  STEADIGROW's customer lists and supplier lists were trade secrets at

11  the time of the misappropriation.

12  132.  Defendants EMANUEL and ELEMENT 6 improperly acquired, used,

13  and disclosed the trade secrets.

14  133.  STEADIGROW was harmed and Defendants EMANUEL and

15  ELEMENT 6 were unjustly enriched through EMANUEL's and ELEMENT 6's

16  misappropriation of STEADIGROW's trade secrets.

17  134.  EMANUEL's and ELEMENT 6's acquisition, use, and disclosure of

18  STEADIGROW's trade secrets were substantial factors in causing Plaintiffs harm,

19  and in causing EMANUEL and ELEMENT 6 to be unjustly enriched.

20  135.  STEADIGROW made reasonable efforts to protect the secrecy of its

21  trade secrets.

22  136.  When EMANUEL and ELEMENT 6 acquired STEADIGROW's trade

23  secrets, EMANUEL knew or had reason to know that he had used improper means

24  to acquire them.

25  137.  As a proximate result of EMANUEL's misappropriation of

26  STEADIGROW's trade secrets, Plaintiffs have suffered damage in an amount to be

27  determined at trial but in an amount which Plaintiffs estimate to be not less than $2

28  million.

LURIE & PARK
Los Angeles

24

COMPLAINT

138.   EMANUEL acted willfully and maliciously in misappropriating the trade secrets of STEADIGROW, and/or with knowing disregard of the probable consequences of his conduct, and deliberately failed to avoid those consequences.

139.   The conduct of EMANUEL and Does 1 through 50, inclusive, is, and has been, intentional, malicious, oppressive, and despicable, and is, and has been, designed to injure Plaintiffs. Each Plaintiff herein is therefore entitled to an award of punitive damages against these named Defendants herein in an amount according to proof.

## TENTH CAUSE OF ACTION
**(Federal Trademark Infringement - 15 USC § 1114 - By STEADIGROW, INC.
Against ELEMENT 6, EMANUEL and DOES 1-50)**

140.   Plaintiffs hereby incorporate by reference paragraphs 1 through 139 of this Complaint as if set forth in full in this paragraph.

141.   Plaintiffs develop products for the garden industry and market them to key accounts and box stores in the U.S. and Canada.

142.   Defendant EMANUEL entered into an agreement with the shareholders of STEADIGROW to market and distribute STEADIGROW's products to the U.S. and Canada market. The parties formed ELEMENT 6 for the purposes of marketing and distributing STEADIGROW's products in the U.S. and Canada. Due to the fraudulent and illegal conduct of EMANUEL as set forth above, STEADIGROW rescinded its authorization for ELEMENT 6 to utilize its trademark.

143.   Despite receiving express knowledge that STEADIGROW rescinded its trademark license, ELEMENT 6 has continued to utilize STEADIGROW's trademark to market and distribute products that are substantially similar to those developed and produced by STEADIGROW in the U.S. and Canada. ELEMENT 6 and EMANUEL's conduct will likely cause confusion, mistake, and deception among the purchasing market for STEADIGROW'S products and interfere with

1 STEADIGROW'S ability to use its mark to indicate a single source of quality

2 controlled source of goods and services.

3   144. Since STEADIGROW demanded that ELEMENT 6 cease and desist

4 using its trademark, EMANUEL and ELEMENT 6 have developed and used

5 trademarks, which are substantially similar in appearance and meaning to the

6 registered and unregistered trademarks of STEADIGROW.

7   145. STEADIGROW first used its trademark in 2005.  Defendant first used

8 the trademark of STEADIGROW, with STEADIGROW's consent, in 2006.

9 STEADIGROW withdrew its consent for ELEMENT 6 to use its trademarks in or

10 around July 2009.

11   146. STEADIGROW uses its trademark for the sale and marketing of

12 garden products, including its Mulch Block®.

13   147. EMANUEL and ELEMENT 6 utilize a trademark, which is

14 substantially similar to STEADIGROW's trademark on a product named Mulch

15 Brick.  EMANUEL and ELEMENT 6 have continued to use the same Uniform

16 Product Code (UPC) attributable to STEADIGROW'S products.

17   148. Both STEADIGROW's and ELEMENT 6's garden products, as well

18 as other garden products which Plaintiff is informed and believes may be marketed

19 under other names by EMANUEL, are marketed in the U.S. and Canada.

20   149. STEADIGROW utilizes its trademark on its marketing materials,

21 including, but not limited to, its web site and product labels and in-store marketing

22 displays.  ELEMENT 6 utilizes its trademark on its marketing materials, including

23 its web site, product labels, and in-store marketing materials.  Both STEADIGROW

24 and ELEMENT 6 also utilize their trademarks on the web sites of companies that

25 offer Plaintiffs' and Defendants' respective products for sale, including, but not

26 limited to, Canadian Tire, Amazon and Ace Hardware.

27

28

LURIE & PARK
LOS ANGELES

COMPLAINT

150.   Plaintiff STEADIGROW is the owner of the registered trademark for the Mulch Block®, registered with the U.S. Patent and Trademark Office on March 20, 2007 (registration #3219506).

151.   On March 10, 2007, EMANUEL accessed the U.S.P.T.O. web site and assigned the trademark for the Mulch Block® from STEADIGROW to ELEMENT 6, without authorization from any officer, director, or shareholder of STEADIGROW.

152.   In March 2009, when AGNES, one of the owners of STEADIGROW, discovered the fraudulent transfer of the trademark to ELEMENT 6, the necessary documents were completed to dispute the transfer and transfer the trademark back to STEADIGROW on April 1, 2009.

153.   EMANUEL has registered a new domain and launched a similar product called Mulch Brick and placed the Mulch Brick on the original Mulch Block® web site. EMANUEL has continued to sell The Original Mulch Block® after receiving a letter from counsel for STEADIGROW demanding that he cease and desist from infringing upon STEADIGROW's trademark and engaging in unfair competition.

154.   EMANUEL has placed the Mulch Brick on the Amazon web site using the original Mulch Block's description, and has placed the DVD made for the original Mulch Block on the web site for the Mulch Brick.

155.   EMANUEL has created labels for the Mulch Brick, which are similar in color and style to the labels for The Original Mulch Block®.

156.   STEADIGROW's Mulch Block® was the first product of its kind offered for sale in the U.S. and Canada.

157.   EMANUEL and ELEMENT 6 developed a trademark substantially similar to STEADIGROW's trademark and product labels, which is likely to cause confusion or mistake, or to deceive as to the affiliation, connection or association of

COMPLAINT

LURIE & PARK
Los Angeles

1    Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of

2    Defendants' goods and/or commercial activities by Plaintiffs.

3        158.  EMANUEL and ELEMENT 6 had actual notice of STEADIGROW's

4    registration of its trademark.

5        159.  EMANUEL's and ELEMENT 6's deceptively similar labels and

6    trademarks have resulted in actual confusion and/or deception of customers,

7    suppliers, and others.

8        160.  As a result of the infringement upon STEADIGROW's trademark,

9    STEADIGROW has sustained damages, in an amount according to proof at trial but

10   which Plaintiffs estimate to be not less than $2 Million, as well as injury to

11   Plaintiffs' reputation and good will and the cost of advertising to correct confusion

12   resulting from Defendants' wrongful acts and profits obtained by Defendants as a

13   result of the wrongful use of STEADIGROW's trademark and reasonable royalty or

14   license fees for Defendants' use of Plaintiffs' trademark and/or trade name.

15   STEADIGROW is thereby entitled to injunctive relief, an accounting, damages,

16   attorneys' fees and costs.

17       161.  The conduct of EMANUEL and ELEMENT 6 and DOES 1-50,

18   Inclusive, is, and has been, intentional, malicious, oppressive and despicable and it

19   is, and has been, designed to injure Plaintiffs.  STEADIGROW is therefore entitled

20   to an award of punitive damages against these named Defendants in an amount

21   according to proof.

22                    **ELEVENTH CAUSE OF ACTION**
       **(Federal Unfair Competition - By STEADIGROW, INC. Against ELEMENT**
23                   **6, EMANUEL and DOES 1-50)**

24       162.  Plaintiffs hereby incorporate by reference paragraphs 1 through 161 of

25   this Complaint as if fully set forth herein.

26   By the actions described above, ELEMENT 6 and EMANUEL (sometimes

27   collectively referred to as "DEFENDANTS") have infringed and continue to

28

LURIE & PARK
Los Angeles

COMPLAINT

1  infringe STEADIGROW's rights, in violation of § 43(a) of the Lanham Act, aka 15
2  USC § 1125(a).

3      163.  DEFENDANT'S activities constitute false designation of origin, unfair
4  competition, and false advertising in violation of § 43(a) of the Lanham Act.

5      164.  STEADIGROW has suffered and continues to suffer irreparable injury
6  for which it has no adequate remedy at law.  STEADIGROW requests a
7  preliminary and permanent injunction against ELEMENT 6'S and EMANUEL'S
8  further infringing conduct.

9      165.  DEFENDANTS have profited from their infringing and unlawful
10  conduct, and they continue to profit from such conduct.  STEADIGROW should
11  receive damages from DEFENDANTS in an amount subject to proof at trial as a
12  consequence of DEFENDANTS' activities.

13     166.  DEFENDANTS have willfully, wantonly, and maliciously committed
14  the aforementioned conduct.  STEADIGROW thereby seeks and should receive an
15  award of its reasonable attorneys' fees and costs as well as treble its actual
16  damages, under 15 USC § 1117(a).  STEADIGROW further requests the cost of
17  corrective advertising.

18

19            **TWELFTH CAUSE OF ACTION**
20  **(Federal Trademark Dilution - By STEADIGROW, INC. Against ELEMENT
6, EMANUEL and DOES 1-50)**

21     167.  Plaintiffs hereby incorporate by reference paragraphs 1 through 166 of
22  this Complaint as if fully set forth herein.

23     168.  The purchasing market for STEADIGROW's goods identifies The
24  Original Mulch Block® as a product of a particular level of quality, including, but
25  not limited to, its beneficial effect on soil and / or gardens.

26     169.  DEFENDANTS' activities, as set forth in this Complaint and most
27  particularly ¶¶ 138 – 159, has diminished and will continue to diminish the public's

28

LURIE & PARK
LOS ANGELES

COMPLAINT

1    faith in STEADIGROW's products and / or decrease the extent to which the public

2    associates The Original Mulch Block® with STEADIGROW.

3        170.   DEFENDANT'S activities in this regard have caused and will

4    continue to cause irreparable harm to STEADIGROW, thereby entitling

5    STEADIGROW to injunctive relief.

6        171.   DEFENDANTS have willfully, wantonly, and maliciously committed

7    the aforementioned conduct. STEADIGROW thereby seeks and should receive an

8    award of its reasonable attorneys' fees and costs as well as treble its actual

9    damages, under 15 USC § 1117(a). STEADIGROW further requests the cost of

10    corrective advertising.

11

12                   **THIRTEENTH CAUSE OF ACTION**
      **(California Bus. & Prof. Code §§ 14320 - By STEADIGROW, INC. Against**

13               **ELEMENT 6, EMANUEL and DOES 1-50)**

14

15        172.   Plaintiffs hereby incorporate by reference paragraphs 1 through 171 of

16    this Complaint as if fully set forth herein.

17        173.   The aforementioned activities by DEFENDANTS infringe and

18    continue to infringe STEADIGROW'S registered trademarks – thereby causing

19    confusion, mistake, and / or deception in the marketplace for STEADIGROW'S

20    products in violation of California Bus. & Prof. Code Sec. 14320.

21        174.   DEFENDANT'S activities in this regard have caused and will

22    continue to cause irreparable harm to STEADIGROW, thereby entitling

23    STEADIGROW to injunctive relief.

24        175.   DEFENDANTS have willfully, wantonly, and maliciously committed

25    the aforementioned conduct. STEADIGROW thereby seeks and should receive an

26    award of its reasonable attorneys' fees and costs as well as treble its actual

27    damages, under 15 USC § 1117(a). STEADIGROW further requests the cost of

28    corrective advertising.

## FOURTEENTH CAUSE OF ACTION
### (State Trademark Dilution [California Bus. & Prof. Code Sec. 14430] - By STEADIGROW, INC. Against ELEMENT 6, EMANUEL and DOES 1-50)

176.   Plaintiffs hereby incorporate by reference paragraphs 1 through 175 of this Complaint as if fully set forth herein.

177.   The aforementioned activities by DEFENDANTS have injured and will continue to injure STEADIGROW'S reputation and business. DEFENDANTS' conduct constitutes trademark dilution under California Bus. & Prof. Code Sec. 14330.

178.   DEFENDANTS' activities in this regard have caused and will continue to cause irreparable harm to STEADIGROW, thereby entitling STEADIGROW to injunctive relief.  STEADIGROW must receive injunctive relief to prevent DEFENDANTS' from diluting the mark and adversely impacting STEADIGROW'S business reputation.

## FIFTEENTH CAUSE OF ACTION
### (California Bus. & Prof. Code §§. 17500 and 17535 - By STEADIGROW, INC. Against ELEMENT 6, EMANUEL and DOES 1-50)

179.   Plaintiffs hereby incorporate by reference paragraphs 1 through 178 of this Complaint as if fully set forth herein.

180.   The aforementioned activities by DEFENDANTS represent deceptive advertising.

181.   Defendants knew or should have known that their conduct, particularly associating their products with STEADIGROW'S distinct products and even using the same UPC codes to increase the resulting confusion, would adversely affect STEADIGROW'S reputation and promotional efforts.  This conduct constitutes false advertising in violation of California Bus. & Prof. Code §§ 17500 and 17535, and California common law.

LURIE & PARK
Los Angeles

31

1   182.   DEFENDANT'S activities in this regard have caused and will

2   continue to cause irreparable harm to STEADIGROW, thereby entitling

3   STEADIGROW to injunctive relief.  STEADIGROW must receive injunctive relief

4   to prevent DEFENDANTS' from diluting the mark and adversely impacting

5   STEADIGROW'S business reputation and advertising efforts.

6       183.   STEADIGROW should receive DEFENDANTS' profits from

7   DEFENDANTS' unlawful activities, subject to proof at trial, including costs and

8   attorneys' fees.

9                    **SIXTEENTH CAUSE OF ACTION**
    **(For Injunctive Relief - By STEADIGROW, INC. Against ELEMENT 6,**
10                    **EMANUEL and DOES 1-50)**

11      184.   Plaintiffs hereby incorporate by reference paragraphs 1 through 183 of

12  this Complaint as if set forth in full in this paragraph.

13      185.   As a result of the illegal, wrongful, misleading and fraudulent conduct

14  of Defendants alleged herein, Plaintiffs are entitled to temporary, preliminary, and

15  permanent injunctive relief prohibiting EMANUEL or any agents, employees, or

16  other persons working under his control or license from utilizing the corporate

17  assets of STEADIGROW, including its trademark, monetary assets and goodwill,

18  or the Mulch Block® itself.

19                   **SEVENTEENTH CAUSE OF ACTION**
    **(For Appointment of a Receiver - By STEADIGROW, INC. Against**
20                 **ELEMENT 6, EMANUEL and DOES 1-50)**

21      186.   Plaintiffs hereby incorporate by reference paragraphs 1 through 185 of

22  this Complaint as if set forth in full in this paragraph.

23      187.   As a result of the illegal, wrongful, misleading and fraudulent conduct

24  of DEFENDANTS alleged herein, Plaintiffs are entitled to the appointment of a

25  receiver.   Plaintiffs have an interest in property, including but not limited to

26  trademark rights, ELEMENT 6's profits, and EMANUEL's profits, that

27  DEFENDANTS wrongfully obtained.  DEFENDANTS have received notice of

28  Plaintiffs' intent to seek a receiver through this petition.

LURIE & PARK
LOS ANGELES

32

COMPLAINT

## EIGHTEENTH CAUSE OF ACTION
**(Breach of Contract - By ELIZABETH, AGNES and CLIFFORD Against EMANUEL and DOES 1-50)**

188.   Plaintiffs hereby incorporate by reference paragraphs 1 through 187 of this Complaint as if set forth in full in this paragraph.

189.   Plaintiffs ELIZABETH, AGNES and CLIFFORD entered into a contract with EMANUEL entitled *Element 6 Products LLC Operating Agreement*, a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

190.   Defendant EMANUEL breached the Operating Agreement as set forth above.

191.   Plaintiffs ELIZABETH, AGNES and CLIFFORD did all, or substantially all, of the things the contract required them to do except those things which they were excused from doing

192.   Plaintiffs were harmed by Defendants' breach in an amount according to proof, but in an amount, which Plaintiffs estimate to be not less than $2 million. As a result of Defendant's breach, Plaintiffs are entitled to reasonable attorney fees.

## NINETEENTH CAUSE OF ACTION
**(Unjust Enrichment - By All Plaintiffs Against EMANUEL, ELEMENT 6 and DOES 1-50)**

193.   Plaintiffs hereby incorporate by reference paragraphs 1 through 192 of this Complaint as if set forth in full in this paragraph.

194.   By the aforementioned conduct, DEFENDANTS have received benefits that would constitute unjust enrichment at the expense of the Plaintiffs.

195.   Plaintiffs thereby seek that DEFENDANTS disgorge any profits, monies, or other benefits received in this manner.

///

///

///

LURIE & PARK
Los Angeles

COMPLAINT

WHEREFORE, PLAINTIFFS pray for the following relief:

**On All Causes of Action Except for the Third, Fourth, Fifth, Seventh, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Seventeenth and Nineteenth Causes of Action:**

1.    That Plaintiffs be awarded damages in an amount to be proven at trial on the First through Fourth Causes of Action herein, but not less than $2,000,000

2.    For punitive damages according to proof at the time of trial;

3.    For Restitution of all sums paid as a result of any fraudulent representations;

4.    For prejudgment interest and costs;

**On the Third, Fourth, and Seventh Cause of Actions:**

5.    For compensatory damages in an amount subject to proof at trial, but under no circumstances less than $2,000,000.

6.    For Restitution of all sums paid as a result of any fraudulent representations;

7.    For costs of suit herein incurred;

8.    For prejudgment interest and costs;

9.    For punitive damages; and

10.    For such other and further relief as the Court may deem proper.

**On the Ninth Cause of Action:**

11.    For injunctive relief prohibiting EMANUEL or any agents, employees, or other persons working under his control or license from utilizing the corporate assets of STEADIGROW, including its trademark, monetary assets and goodwill, or the Mulch Block® itself;

12.    For costs of suit herein incurred;

LURIE & PARK
LOS ANGELES

34

COMPLAINT

13.   For prejudgment interest and costs;

14.   For punitive damages; and

15.   For such other and further relief as the Court may deem proper.

**On the Fifth Cause of Action and the Tenth through Fifteenth Causes of Action:**

16.   For injunctive relief prohibiting EMANUEL or any agents, employees, or other persons working under his control or license from utilizing the corporate assets of STEADIGROW, including its trademark, monetary assets and goodwill, or the Mulch Block® itself;

17.   That the Court enter an order against DEFENDANTS to prevent them from willfully infringing upon STEADIGROW'S mark, that DEFENDANTS cease taking actions to confuse the origin of STEADIGROW'S products, and that DEFENDANTS cease their false advertising practices with regard to STEADIGROW'S products;

18.   That DEFENDANTS account for and pay to STEADIGROW all gains, profits, and advantages derived by it from the unlawful activities described in these paragraphs;

19.   That DEFENDANTS deliver to STEADIGROW all promotional materials that bear the infringing materials and / or misleading advertising;

20.   For treble damages for particular willful and wanton conduct, as provided for by the applicable statutes;

21.   For costs of suit herein incurred;

22.   For prejudgment interest and costs;

23.   That DEFENDANTS pay all reasonable attorneys' fees incurred as a result of these proceedings; and

24.   For such other and further relief as the Court may deem proper.

COMPLAINT

1   **On the Seventeenth Cause of Action:**

2        25.    That the Court appoint a receiver for ELEMENT 6 and

3   STEADIGROW, INC.;

4        26.    For punitive damages according to proof at the time of trial;

5        27.    For prejudgment interest and costs;

6

7   **On the Eighteenth Cause of Action:**

8        28.    That Plaintiffs be awarded damages in an amount to be proven at trial

9   on the First through Fourth Causes of Action herein, but not less than $2,000,000

10       29.    For punitive damages according to proof at the time of trial;

11       30.    For prejudgment interest and costs;

12       31.    For reasonable attorneys' fees as provided by contract.

13

14  **On the Eighteenth Cause of Action:**

15       32.    That Plaintiffs be awarded damages in an amount to be proven at trial

16  on the First through Fourth Causes of Action herein, but not less than $2,000,000

17       33.    For punitive damages according to proof at the time of trial;

18       34.    For prejudgment interest and costs; and

19       35.    For reasonable attorneys' fees as provided by contract.

20

21  **On the Nineteenth Cause of Action:**

22       36.    That Plaintiffs be awarded damages in an amount to be proven at trial

23  on the First through Fourth Causes of Action herein, but not less than $2,000,000

24       37.    For punitive damages according to proof at the time of trial; and

25       38.    For prejudgment interest and costs.

26  ///

27  ///

28  ///

LURIE & PARK
Los Angeles

36

COMPLAINT

## DEMAND FOR JURY TRIAL

PLAINTIFFS demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(a) and the local rules of this Court.

DATED: June 11, 2010                          LURIE & PARK


/s/ Barak Lurie
_____

Barak Lurie
LURIE & PARK

Attorneys for Attorneys for Plaintiffs
STEADIGROW, INC., ELIZABETH
HAMILTON, AGNES HAMILTON,
and GRAHAM CLIFFORD

Exhibit A

# LLC Operating Agreement of Element 6 Products, LLC
## a California Limited Liability Company

Effective as of March 10, 2006, Michael Emanuel, Agnes Hamilton, Elizabeth Guimond, and Graham and Mary Clifford, hereinafter referred to as "the Members", enter into this Operating Agreement.

**RECITALS**

A. The Members have formed a limited liability company (the "Company") under the laws of the state of California.

B. The Members enter into this Operating Agreement in order to form and provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

**ARTICLE I - DEFINITIONS**

The following terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

1.1 "Act" means the Beverly-Killea Limited Liability Company Act commencing with California Corporations Code § 17000 as amended from time to time.

1.2 "Agreement" means this operating agreement, as originally executed and as amended from time to time.

1.3. "Articles of Organization" means the document required to be filed with the applicable office of the state of California required to establish a limited liability company in California.

1.4. "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.5. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.6. "Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.2.

1.7. "Capital Contribution" means, with respect to any Member, the amount of the money, the forgiveness of any debt, and the Fair Market Value of any services or property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution shall not be deemed a loan.

1.8. "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.9. "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.10. "Company" means the company named in Article II, Section 2.2.

1.11. "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management, or except as is provided in § 17106 of the Act, any right to information concerning the business and affairs of the Company.

1.12. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.13. "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.14. "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a) The Fair Market Value of any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(b) The Fair Market Value of any item of Company property distributed to any Member shall be the value of such item of property on the date of distribution, as mutually agreed by the distributee Member and the Company; and

(c) Fair Market Value for purposes of Article VIII, Section 8.10 and Article IX, Section 9.3, shall be as determined under that section.

1.15. "Initial Member" or "Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.16. "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.17. "Losses". See "Profits and Losses".

1.18. "Majority of Members" means a Member or Members whose Voting Interests represent more than 50 percent of the Voting Interests of all the Members entitled to vote; "Supermajority of Members" means a Member or Members whose Voting Interests represent more than 67 percent of the Voting Interests of all the Members entitled to vote; it being understood and agreed that the following Members shall be excluded from voting on the following issues:

(a) with respect to the admission of a Transferee as a Substituted Member, the Member assigning his Economic Interest to the Transferee;

(b) with respect to the exercise of an option to void a Prohibited Transfer pursuant to Article VIII, Section 8.7(i), the transferring Member;

(c) with respect to the disposition of a Member's Membership Interest in the Company, the Member disposing of his, her, or its Membership Interest as restricted by the provisions of Article VIII, Section 8.9; and

(d) with respect to a vote to continue the business of the Company pursuant to Article X, Section 10.1(a), the deceased, incapacitated, withdrawing, bankrupt, or dissolved corporate Member.

When a Member or Members are excluded from voting pursuant to this Agreement (other than by reason of being a non-voting Member), the term "Majority of remaining Members" means a Member or Members whose Voting Interests represent more than 50 percent of the Voting Interests of all of the Members who are not excluded from voting.

1.19. "Manager" means the Member or Members designated in Article II, Section 2.6.

1.20. "Meeting" is defined in Article V, Section 5.4.

1.21. "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

Page 2

1.22. "Membership Interest" means a Member's rights in the Company including the Member's Economic Interest, any right to vote or participate in management, and any right to information concerning the business and affairs of the Company provided by the Act.

1.23. "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, by certified mail or for overnight delivery, postage and fees prepaid, in the United States mail; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.24. "Percentage Interest" of each Member in the Company is the same percentage as each such Member's allocation of Profits and Losses is to all Profits and Losses, as set forth in Section 4.1 below.

1.25. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.26. "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC section 703 (a).

1.27. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.28. "Substituted Member" is defined in Article VIII, Section 8.11.

1.29. "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.30. "Transfer" means, with respect to a Membership Interest, or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.31. "Triggering Event" is defined in Article VIII, Section 8.4.

1.32. "Vote" means a written consent or approval, a ballot cast at a Meeting, or a voice vote.

1.33. "Voting Interest" means, with respect to a Member, the right to Vote the Voting Units specified in Article VII, Section 7.1 and Exhibit "B" attached hereto.

1.34. "Voting Units" means with respect to a Member, the Member's right to participate in the management of the Company (to the extent permitted by this Agreement or applicable law) in proportion to other voting Members of the Company expressed as a number. The total of all voting Members' Voting Units shall equal 100.

## ARTICLE II - ARTICLES OF ORGANIZATION AND THE OPERATING AGREEMENT

2.1. The Members have caused Articles of Organization under the name of Element 6 Products, LLC to be filed in accordance with the Act. A true and correct copy of the Articles of Organization as filed by the California Secretary of State are attached to this Agreement as Exhibit "A" and incorporated herein by this reference.

2.2. The name of the Company shall be Element 6 Products, LLC.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with their Percentage Interests. The Members initial Percentage Interests are as specified in Exhibit "B" attached hereto and incorporated herein by this reference. However, the Members acknowledge and agree that their respective Percentage Interests are subject to reduction and dilution if and to the extent the Company obtains additional equity investment or debt convertible to equity that is ultimately so converted.

4.2. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg. sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5), or 1.704-1 (b)(2)(ii)(d)(6), as same may be amended from time to time, or under any successor statutes thereof, items of Company gross income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section 4.2 shall be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocations of income and loss and all other items shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred. The provisions of this Section 4.2 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Reg sections 1.704-1(b) and 1.704-2, as same may be amended from time to time, or under any successor regulations thereof, and shall be interpreted and applied in a manner consistent with such Regulations.

4.3. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property, and such Profits or Losses shall be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.3, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

4.4. In the case of a Transfer of an Economic Interest during any fiscal year, the Assigning Member and Assignee shall each be allocated a share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

4.5. Cash resulting from the normal business operations of the Company and from a Capital Event shall be distributed as follows: (a) Company shall distribute cash in sufficient amount on or before March 30th following the end of each fiscal year to cover any tax liabilities the Members may incur as a result of K-1's issued to them by the Company. The distribution must be enough to cover the highest marginal tax rate of any member, including State taxes, if any. If Members who are non-residents of California do not sign California form FTB 3832 (Limited Liability Company Nonresident Members' Consent), the LLC will not make such distributions to such Members and the Company will instead pay tax on the Member's distributive share of income at that Member's highest marginal rate, (b) the timing and amount of other distributions will be recommended by the Manager and, upon approval by a Supermajority of Members, distributed in accordance with each Member's Percentage Interest, (c) no distributions, except as specified in 4.5(a), shall be declared or made if, after giving it effect, the Company would not be able to pay its loan obligations, or its debts and liabilities as they become due in the usual course of business; if the Company's total assets would be less than the sum of its total liabilities; or if the distributions would otherwise violate the provisions of § 17254 of the Act.

4.6. If the proceeds from a sale or other disposition of an item of the Company consists of property other than cash, the value of such property shall be as determined by the Members. Such non-cash proceeds shall then be allocated among all the Members in proportion to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash, such cash shall be distributed to each Member in accordance with Section 4.5.

4.7. Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions

Page 5

to the Members' Capital Accounts, shall be made before the final distribution is made. The final distribution to the Members shall be made to the Members to the extent of and in proportion to their positive Capital Account balances.

## ARTICLE V: MANAGEMENT

5.1. The business of the Company shall be managed by the Manager or Managers named in Article II, Section 2.6, or a successor Manager selected by a Supermajority of Members. The Manager shall be the President of the Company and may sign documents on behalf of the Company as the Manager or as the President. Except as otherwise set forth in this Agreement, all decisions concerning the operation and management of the Company's business shall be made by the Manager. Notwithstanding and without limiting the foregoing, the Manager shall not take any of the following actions on behalf of the Company unless a Supermajority of Members have consented to the taking of such action:
(a) Any act that would make it impossible to carry on the ordinary business of the Company;
(b) Any confession of a judgment against the Company;
(c) The dissolution of the Company;
(d) The disposition of any Company assets not in the ordinary course of business;
(e) The incurring of any debt not in the ordinary course of business whether or not such debt may be convertible into equity;
(f) A change in the nature of the principal business of the Company;
(g) The payment or distribution of any assets or salaries to any Member;
(h) The filing of a petition in bankruptcy or the entering into of an arrangement among creditors;
(i)The entering into, on behalf of the Company, of any transaction constituting "reorganization" within the meaning of § 17600 of the Act;
(j) The admission of any new Member or the consent to the admission as a Substituted Member of any Assignee;
(k) The solicitation and the obtaining of additional investment capital which would or could result in the dilution of the Members' Percentage Interests;
(l) A compromise of the obligation of a Member to make a Capital Contribution;
(m) The sale, exchange, or other disposition of all, or substantially all, of Company's assets occurring as part of a single transaction or plan;
(n) The merger of Company with any other limited liability company, limited partnership, or corporation;
(o) Notwithstanding any other provisions of the Agreement, the incurring of any debt or liability of more than $10,000 (ten thousand dollars) unless such debt or liability is (1) consistent with a budget previously approved by Supermajority of members, or (2) required by contract;
(p) The employment of professionals, including accountants and attorneys, to perform services for Company;
(q) The retention and compensation of employees;
(r) The entering into any contract or agreement for which the term would extend for more than one year.

A declaration by the Manager, stating that a Supermajority of Members have approved any specific action concerning the management of the Company's business as set forth in this Section 5.1, shall be conclusive to any third party that a Supermajority of Members have approved such stated specific action and that the Manager is authorized to perform such action on behalf of the Company. A Supermajority of Members may authorize the Manager to take any action set forth above by a written consent executed with or without a meeting. The Manager may amend this Agreement from time to time by the insertion of a revised Exhibit "B", noting thereon the effective date thereof, to reflect any adjustments in Percentage Interests or Voting Interests of the Members resulting from any investment of additional equity in the Company or the conversion of convertible debt to equity approved by a Supermajority of Members as provided in Article VII, Section 7.1. Any such revised Exhibit "B" shall be conclusive among the Members and to any third party as to the Interests reflected therein.

5.2. The Manager shall serve until the earlier of (1) the Manager's resignation, retirement, death, or disability; (2) the Manager's removal by a vote of a Supermajority of Members; or (3) the expiration of the Manager's term as Manager.. A new Manager or Managers shall be appointed by a Supermajority of Members on the occurrence of any of the foregoing events, in accordance with the provisions of section 5.3.

5.3. Each Manager shall be appointed by a Supermajority of Members for (a) a term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by a Supermajority of

Members in connection with such an appointment. A Manager may be removed with or without cause at any time by action of a Supermajority of Members, and the execution and filing of a Certificate of Amendment of the Articles of Organization, if necessary, to provide that the Company is to be managed by a different number of managers than set forth above.  Any such Certificate of Amendment shall be subject to the provisions of Article VII, Section 7.1.

5.4. The Members are not required to hold meetings, and decisions may be reached through one or more informal consultations followed by agreement among a Majority of Members, provided that a Majority of Members are consulted (although all Members need not be present during a particular consultation), or by a written consent signed by a Majority of Members. In the event that Members wish to hold a formal meeting (a "Meeting") for any reason, the following procedures shall apply: (a) Any two Members may call a Meeting of the Members by giving Notice of the time and place of the Meeting at least 48 hours prior to the time of the holding of the Meeting. The Notice shall reasonably specify the purpose, location and time of the Meeting. (b) A Majority of Members shall constitute a quorum for the transaction of business at any Meeting of the Members. (c) The transactions of the Members at any Meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a Meeting duly held after call and notice if a quorum is present and if, either before or after the Meeting, each Member not present signs a written waiver of Notice, a consent to the holding of the Meeting, or an approval of the minutes of the Meeting.  (d) Any action required or permitted to be taken by the Members under this Agreement may be taken without a Meeting if a Majority of the Members individually or collectively consent in writing to such action. (e) Members may participate in the Meeting through the use of a conference telephone or similar communications equipment, provided that all Members participating in the Meeting can hear one another. (f) The Members shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all Meetings, Notices, and waivers of Notices of Meetings, and all written consents in lieu of Meetings.

5.5. It is acknowledged that the Members have other business interests to which they devote part of, a majority of, or all of their time, and such Members shall not be required to devote 100% of their time and effort to the Company.

5.6. All assets of the Company, whether real or personal, shall be held in the name of the Company.

5.7. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by a Supermajority of Members. Withdrawal from such accounts shall require the signature of the Manager or of such person or persons as a Supermajority of Members may designate.

ARTICLE VI: ACCOUNTS AND RECORDS

6.1. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours. The costs of such inspection and copying shall be borne by the Member requesting same.

6.2. Financial books and records of the Company shall be kept on the accrual method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes. A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term if the Manager deems it necessary, the Manager shall keep or cause to be kept the books of account referred to in Section 6.2, and the following:
(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;
(b) A copy of the Articles of Organization, as amended;
(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;
(d) Executed counterparts of this Agreement, as amended;

Page 7

11.4.   Arbitration.

Each Member and the Company shall have the right to apply to a court to enjoin any breach of this Agreement. Excepting the right of a Member and the Company to seek such relief, any dispute, claim or controversy, whether sounding in contract, tort or otherwise, arising out of or relating to this Agreement; the relationship between the Members or between the Members and the Company created by this Agreement; or the breach, termination, enforcement, interpretation or validity thereof; including the determination of the scope or applicability of this Agreement to arbitrate; shall be determined by arbitration in Orange County, California, before three (3) arbitrators unless the parties mutually agree on one (1) arbitrator. The arbitration shall be administered by JAMS (formerly known as Judicial Arbitration and Mediation Service) pursuant to its Comprehensive Arbitration Rules and Procedures unless the parties mutually agree upon Streamlined Arbitration Rules and Procedures. Judgment on the arbitration award may, subject to the venue provisions of Section 11.4 below, be entered in any court having jurisdiction. The arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

11.5. This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. Venue for any action shall be in a court of competent jurisdiction sitting in Orange County, California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect. The intent of the parties hereto is that the Company is recognized as a limited liability company under the Act, and all provisions herein are to be interpreted under California law to conform to such intent.

11.6. This Agreement shall be binding on and inure to the benefit of the Members and their heirs, personal representatives, and permitted successors and assigns.

11.7. Whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.8. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the Members.

11.9. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities. The Members intend the Company to be a limited liability company under the Act. No member shall take any action inconsistent with the express intent of the parties to this Agreement.

11.10. Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.11. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.12 The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.13. Time is of the essence of every provision of this Agreement that specifies a time for performance.

11.14. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

Page 15

11.15. This Agreement may be executed in counterparts, each of which shall be deemed an original, and which when all taken together shall constitute one and the same agreement. Each Member who is married agrees to obtain the consent of his or her spouse to the Spousal Consent attached as Exhibit "C".

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement effective as of the day and year first above written.

_____
Michael Emanuel

_____
Agnes Hamilton

_____
Elizabeth Guimond

"Graham and Mary Clifford"

By:_____
        Graham Clifford

By: _____
        Mary Clifford

11.15. This Agreement may be executed in counterparts, each of which shall be deemed an original, and which when all taken together shall constitute one and the same agreement. Each Member who is married agrees to obtain the consent of his or her spouse to the Spousal Consent attached as Exhibit "C".

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement effective as of the day and year first above written.

_____
Michael Emanuel

_a. Hamilton_
_____
Agnes Hamilton


_____
Elizabeth Guimond

"Graham and Mary Clifford"

By:_____
    Graham Clifford

By:_____
    Mary Clifford

11.15. This Agreement may be executed in counterparts, each of which shall be deemed an original, and which when all taken together shall constitute one and the same agreement. Each Member who is married agrees to obtain the consent of his or her spouse to the Spousal Consent attached as Exhibit "C".

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement effective as of the day and year first above written.

_____
Michael Emanuel

_____
Agnes Hamilton

_____
Elizabeth Guimond

"Graham and Mary Clifford"

By: _____
     Graham Clifford

By: _____
     Mary Clifford

EXHIBIT "A"

Articles of Organization



EXHIBIT "B"

Members' Percentage Interests and Voting Interests

The Members shall have the following initial Percentage Interests:

Michael Emanuel:            Fifty percent (50%) of the total
Agnes Hamilton:             Twenty-two and one-half percent (22.5%) of the total
Elizabeth Guimond:          Nineteen and one-half percent (19.5%) of the total
Graham and Mary Clifford:   Eight percent (8%) of the total

The Members shall have Voting Interests with respect to the following initial Voting Units:

Michael Emanuel:            Fifty                          (50) Voting Units
Agnes Hamilton:             Twenty-two and one-half        (22.5) Voting Units
Elizabeth Guimond:          Nineteen and one-half          (19.5) Voting Units
Graham and Mary Clifford:   Eight                          ( 8) Voting Units
Total Voting Units                                         100

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
STEADIGROW, INC. et al.

**DEFENDANTS**
MICHAEL EMANUEL et al.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Barak Lurie (LURIE & PARK, 11355 West Olympic Blvd., Suite 200, Los Angeles, California 90064; Phone: (310)-478-7788; Fax: (310)-347-4442

Attorneys (If Known)
Barak Lurie (SBN 144887)
Stephen Weaver (SBN 262121)

BY FAX

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in this State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (Place an X in one box only.)
☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☑ MONEY DEMANDED IN COMPLAINT: $ 2,000,000/ subject proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

OTHER STATUTES: ☐400 State Reapportionment ☐410 Antitrust ☐430 Banks and Banking ☐450 Commerce/ICC Rates/etc. ☐460 Deportation ☐470 Racketeer Influenced and Corrupt Organizations ☐480 Consumer Credit ☐490 Cable/Sat TV ☐810 Selective Service ☐850 Securities/Commodities/Exchange ☐875 Customer Challenge 12 USC 3410 ☐890 Other Statutory Actions ☐891 Agricultural Act ☐892 Economic Stabilization Act ☐893 Environmental Matters ☐894 Energy Allocation Act ☐895 Freedom of Info. Act ☐900 Appeal of Fee Determination Under Equal Access to Justice ☐950 Constitutionality of State Statutes

CONTRACT: ☐110 Insurance ☐120 Marine ☐130 Miller Act ☐140 Negotiable Instrument ☐150 Recovery of Overpayment & Enforcement of Judgment ☐151 Medicare Act ☐152 Recovery of Defaulted Student Loan (Excl. Veterans) ☐153 Recovery of Overpayment of Veteran's Benefits ☐160 Stockholders' Suits ☐190 Other Contract ☐195 Contract Product Liability ☐196 Franchise

REAL PROPERTY: ☐210 Land Condemnation ☐220 Foreclosure ☐230 Rent Lease & Ejectment ☐240 Torts to Land ☐245 Tort Product Liability ☐290 All Other Real Property

TORTS PERSONAL INJURY: ☐310 Airplane ☐315 Airplane Product Liability ☐320 Assault, Libel & Slander ☐330 Fed. Employers' Liability ☐340 Marine ☐345 Marine Product Liability ☐350 Motor Vehicle ☐355 Motor Vehicle Product Liability ☐360 Other Personal Injury ☐362 Personal Injury-Med Malpractice ☐365 Personal Injury-Product Liability ☐368 Asbestos Personal Injury Product Liability

IMMIGRATION: ☐462 Naturalization Application ☐463 Habeas Corpus-Alien Detainee ☐465 Other Immigration Actions

TORTS PERSONAL PROPERTY: ☐370 Other Fraud ☐371 Truth in Lending ☐380 Other Personal Property Damage ☐385 Property Damage Product Liability

BANKRUPTCY: ☐422 Appeal 28 USC 158 ☐423 Withdrawal 28 USC 157

CIVIL RIGHTS: ☐441 Voting ☐442 Employment ☐443 Housing/Accommodations ☐444 Welfare ☐445 American with Disabilities - Employment ☐446 American with Disabilities - Other ☐440 Other Civil Rights

PRISONER PETITIONS: ☐510 Motions to Vacate Sentence Habeas Corpus ☐530 General ☐535 Death Penalty ☐540 Mandamus/Other ☐550 Civil Rights ☐555 Prison Condition

FORFEITURE / PENALTY: ☐610 Agriculture ☐620 Other Food & Drug ☐625 Drug Related Seizure of Property 21 USC 881 ☐630 Liquor Laws ☐640 R.R. & Truck ☐650 Airline Regs ☐660 Occupational Safety/Health ☐690 Other

LABOR: ☐710 Fair Labor Standards Act ☐720 Labor/Mgmt. Relations ☐730 Labor/Mgmt. Reporting & Disclosure Act ☐740 Railway Labor Act ☐790 Other Labor Litigation ☐791 Empl. Ret. Inc. Security Act

PROPERTY RIGHTS: ☐820 Copyrights ☐830 Patent ☑840 Trademark

SOCIAL SECURITY: ☐861 HIA (1395ff) ☐862 Black Lung (923) ☐863 DIWC/DIWW (405(g)) ☐864 SSID Title XVI ☐865 RSI (405(g))

FEDERAL TAX SUITS: ☐870 Taxes (U.S. Plaintiff or Defendant) ☐871 IRS-Third Party 26 USC 7609

FOR OFFICE USE ONLY: Case Number: SACV10-837 JVS (MLGx)

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)    CIVIL COVER SHEET    Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No  ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☒ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Steondigro W = Aliso Viejo, California<br>Elizabeth Hamilton = Laguna Woods, California | Agnes Hamilton = Brisbane, Australia<br>Graham Clifford = Colac, Victoria<br>Mary Clifford = Colac, Victoria |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Michael Emanel = Orange County, California<br>Element 6 Products, LLC = Orange County, California | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date 6-11-10

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV10- 837 JVS (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.